5029 Long Island Savings v. United States Mr. Infelice May it please the Court. In this case, the trial court erred when it dismissed our special plea in fraud because it erroneously concluded that in order to prevail, we had to prove that Long Island Savings Bank itself was actually involved in the illegal kickback scheme of its CEO and chairman, Mr. James Conway. In fact, what our position was and what we proved at trial, or excuse me, during the summary judgment, was that what was required to prove and what the uncontradicted evidence proves is that, in fact, Mr. Conway misrepresented whether or not Long Island Savings Bank, at the time it entered the assistance agreement, was in compliance with all existing statutes and regulations which affected the safety and soundness of the institution. Because the court focused on the wrong aspect, it analyzed our claim in the wrong light. Had it focused on the misrepresentations of Mr. Conway, there really would have been no issue concerning whether or not those should be imputed to Long Island Savings Bank. It's undisputed that Mr. Conway was engaged in an illegal kickback scheme with his former law firm. It's also undisputed that that illegal kickback scheme created a conflict of interest. As we've demonstrated in our brief, the regulations at the time of the assistance agreement specifically required that there would not be any, or specifically indicated that a conflict of interest inherently created an unsafe and unsound management condition. As the trial court held correctly in this case, what the government contracted for was a full disclosure of any existing conflicts of interest that would have affected the safety and soundness or created an unsafe and unsound condition. Mr. Conway violated that when he certified falsely that, in fact, at the time of the assistance agreement, Long Island Savings Bank was in compliance with all existing statutes and regulations. And there's no doubt that he was the authorized person to make that certification on behalf of the bank? Yes, Your Honor. In fact, as the court pointed out, at the time he was the CEO and chairman, and he was authorized to make the certification at the time of the assistance agreement. So he was acting in his official capacity. Again, where the court basically got off track was it looked at the underlying misconduct that resulted in his criminal conviction and attempted to determine whether Long Island Savings Bank was, in fact, involved in the illegal kickbacks. But for purposes of our claim, it was a misrepresentation by Mr. Conway in his official capacity, which were the basis of our claim. Now, the court also... ...bored resolution somewhere in the record to show that he was authorized to sign on behalf of the bank. I couldn't find it in the record as to the actual authority which he had to execute the assistance agreement on behalf of the bank. There isn't any in the appendix. I would have to look at the record. But I believe there was no dispute that, in fact, at the time he signed it, he was authorized. That's not a disputed fact. No, Your Honor. The court found that, and I don't believe, in this case, Long Island disputes that. He was acting as chairman. He was the CEO at the time. He was acting on behalf of Long Island Savings Bank when he entered that. So he did have a fiduciary duty at that point. Yes, Your Honor, he did. As the CEO. Yes, Your Honor. Now, the court also erred because it concluded that the adverse interest exception precluded the imputation of Mr. Conway's... or conduct to Long Island Savings Bank. The court erred in that respect because even if the adverse interest exception would apply to the situation, as we pointed out as the court explained in In Re Payroll Express, that exception is intended... not intended to apply to a situation where an attempt to use it as a sword to force an innocent third party to be bound to a contract that it entered in in good faith reliance upon the misrepresentations of an agent that the principal cloaked with the authority to make. That's precisely the situation in this case. In other words, between an innocent third party and the principal who gives the agent authority to act on their behalf, the knowledge of the intent, in this case, knowledge of the falsity of the statement and the intent to deceive is imputed to the principal. That's well settled. However, the court in this case said that's not appropriate because it misinterpreted, I believe, the application of the adverse interest exception. It also erred to the extent it concluded that Long Island Savings Bank did not benefit as a result of the misrepresentation. Because as a result of the misrepresentation, the government agreed to the assistance agreement. Long Island Savings Bank was able to acquire the additional thrifts. It obtained 36 additional branches. Its assets increased from $1.2 billion to $4 billion. It immediately received $75 million in assistance, and over the course of the performance of the agreement, another $45 million in assistance. Turning second to the damages phase of the trial, the trial court during the damages phase failed to determine whether, absent the breach, Long Island Savings Bank would have incurred the same damages that occurred in the real world. As this court has repeatedly said, most recently in Bluebonnet, that's a required determination to ensure that a plaintiff does not receive a windfall. In this case, the court awarded cost replacement damages based upon the conversion, excuse me, the merger of Long Island Savings Bank of Syosset and CenterReach and the subsequent conversion of the merged institution to a stock institution. However, all the evidence in this case was that even absent the breach, Long Island would have merged and converted at approximately the same time that it did. That's not disputed. Long Island did not point to any evidence to the contrary, either at trial or upon appeal. In fact, it was Long Island that introduced evidence of that fact through the testimony of Mr. Wink at trial during his case in chief as a predicate or a factual predicate for his claim of reduced IPO proceeds. There is no dispute that, absent the breach, Long Island would have merged and converted. That being the case, the trial court erred because it failed to make any assessment or any analysis concerning what cost Long Island would have incurred even absent the breach. The result of that is a windfall for Long Island because they are obtaining, at this point, damages which represent costs which all the evidence establishes they would have incurred in any case. In fact, if you follow Long Island's argument, they claim that, absent the breach, they would have raised more capital as a result of the IPO and, therefore, their costs would have been at least as much as they were in the actual world. The trial court also erred in its damage analysis when it relied upon hypothetical costs to calculate damages. The result was an award which was inflated and does not reflect Long Island's actual costs. I think this is best evidence by just looking at one document, and that's at A001946. That is a demonstrative presented by Long Island's expert, Professor Kalamaris. What page was that? A2001946. Thank you. It was PX821A presented by Professor Kalamaris. In it, you can see, and this is undisputed, that between 1993 and the conversion, 1998, when Long Island was acquired by Astoria, Long Island Bank paid $66.3 million in dividends, actual dividends. During the same period, according to Professor Kalamaris' model and what the court adopted, there were $174 million in costs. The only way that you get there is because the court adopted Professor Kalamaris' procedure of imputing fictional costs of $107.7 million to retained earnings. That's a cost that Long Island never incurred. Those are dividends that Long Island never paid. So as a result, what we have is a purely hypothetical cost which was used to inflate the damage award. Your first affirmative defense that you argued when you first started on the certification, if that prevails, then you asked for a forfeiture of their claim. That's correct, Your Honor. If that were to happen, then none of this would be relevant, would it? Absolutely, Your Honor. If the claim is forfeited under the forfeiture statute, the entire claim is forfeited, you never get to the damages issue. Assuming that the court does, however, it is apparent on its face that what we have is a damage award that's been inflated by the use of hypothetical costs. Again, the court has stated repeatedly that cost of replacements must be based on actual cost. In this case, they were not. Now, what we really have is a lost profits claim masquerading as a cost of replacement model. And as we've explained in the brief, all that Professor Calamaris really did was take the amount of goodwill lost, approximately $435 million, and multiply it by an assumed cost of capital, 9.06%. That's really nothing more than a lost profits claim based on a leverage value. Well, how would you explain lost profits at that point then? Because they did not actually reach for those profits, right? So it's really a model to determine the potential profits that could have been obtained if, in fact, there was no breach. Correct, exactly. In other words, it's a leverage model. If we would have had this capital, we could have leveraged it and obtained this amount. But that's a lost profits model. And I think, as this Court said in Oldstone, you can't use a claim for lost profits without proving it as a basis for another award. That's precisely what plaintiffs in this case are trying to do. The Court's use of a hypothetical cost also went forward not just for the period 1993, but affected to 1998, but affected the entire period of the damage claim. And the reason for that is because if, in fact, the retained earnings and the proceeds of the IPO replaced all the goodwill, then to the extent dividends were paid at all, they were paid based upon all of that replacement capital. Even as Professor Calamaris admitted, earnings that Long Island made were based earnings on the entire amount of its capital. Yet what he did and what the Court adopted was to artificially separate the IPO proceeds from the retained earnings, calculate a return just on the IPO proceeds of approximately 9.06%, and then say that's the same expectation that investors would have with respect to retained earnings. But they never paid. And I believe I'm into my rebuttal. All right. Thank you. Mr. Tufaro. Thank you, Your Honor, and may it please the Court. I'd like to address a couple of the major points before I get into the specifics. And for clarity, I'll use SIOSIT for the acquiring of parent banks, CENTERREACH for the acquired bank, and the banks for the two entities. First, in regard to fraud, the fundamental flaw in the government's argument is that the government did not ask for a representation as to Conway's conduct or that of any of SIOSIT's officers or directors, and SIOSIT did not give such a representation. To get around this obvious deficiency, the government late in the motions on summary judgment introduced for the first time its safety and soundness argument under 563.17. But the argument is belied by the regulators' actions and by the undisputed evidence that these banks were safely and soundly managed. Crucially, OTS conducted a thorough investigation of both Conway and the banks and determined not to bring any charges against the banks because the banks were the victims of the misconduct and because Conway breached his fiduciary duty to them. Second... Excuse me. How do you answer the government's position on imputed knowledge? The error, Judge Gallarza, is that, first, imputation doesn't depend on who signs the contract and it doesn't affect the interpretation of the contract. That has to be resolved solely on the words of the contract. So the fact that Conway signs the contract doesn't add to the contract a representation in regard to affiliates that the government didn't ask for and that SIASA didn't give. So Judge Margolis correctly, in our view, looked at the question of imputation as whether the conduct should be imputed to the bank. That was the right question. Go ahead and finish. And when you look at the question that way, the adverse exception rule does apply. It has two elements, neither of which were met in this case because Conway was acting outside the scope of his employment in regard to the compensation arrangement and clearly for his sole benefit. What about the materiality clause in the agreement, the material facts? Because he acted as a CEO, so his actions could be imputed to the corporation. Because he had a fiduciary duty of honesty and good dealings with the corporation. But for the adverse interest exception, you would have imputation. But in this case, you have to first begin with the contract construction. If you look at the only relevant representation is in 11B-5, it omits the word affiliates. If you look at the language of the contract, it appears at A2000-26-27. Both 11B-5 and 11B-4 omit the term affiliates, a defined term which would encompass officers and directors. If you compare that with 11B-6 where the term is affiliates, you can see that it's deliberate. And you can understand why it's deliberate. It's unreasonable to expect a corporation at the time of a closing to make a representation that encompasses the personal conduct of all of its officers and directors. So in this instance, the government didn't ask for it. If they had asked for it, the bank could have either said, no, let's negotiate. They could have agreed on what limitations would have been imposed. And they could have agreed on what due diligence would constitute meeting the requirements. But in this case, what the government is saying is, we agree with that. I think they admit that in page 12 of their reply brief, that it did not include the personal conduct of the manager. So their leap is, they want this court to say, which Judge Margolis declined, that Conway's personal misconduct is, per se, unsafe management. And Judge Margolis found that... Judge Margolis, is there a... I'm sorry? I thought there was just Judge Leto. Judge Margolis decided the summary judgment decision. Judge Mayer and Judge Leto. When Judge Leto went on the bench, it got transferred to Judge Leto. How did you get around, then, the order making the statements under the materiality requirements that the material fact necessary to be stated in order to make the statements contained there and not misleading, and there's no fact which materially adversely affects or in the effect the business operations, affairs, or conditions, financial or otherwise, of LISB? You're referring to 11B-5, Judge Guyar? I'm sorry, what? Are you referring to 11B-5? 11B-9. It's on the appendix 2029. Well, this simply encompasses the representations contained in the agreement. There was no representation made outside the scope of this agreement. So the certificate tracked the language of 11B-5, which appears on 26 and 27,   which speaks of LISB, which speaks of LISB, LISB, which at that time was SIASAT, is not in violation of any applicable statute, regulation, or order. That's 11B-5. That's 11B-5. And it does not use the term affiliates. If you contrast that with 11B-6 on the next page, you can see it says LISB or any of its affiliates. So these parties, as is typical in these corporate transactions, excluded from the representations anything having to do with the personal conduct of the banks, officers, and directors. So the representation was speaking of only the corporate entity. Now there's a corporate entity. It operates through people. I'm sorry? It operates through these people. Yes, of course it does. But the question is, does that mean that every personal misconduct of an officer or director of the bank is per se unsafe management? Well, it depends on what it is. We're talking about this one. Well, we're talking about this one as of the time of the contract signing. That's the only date as to which a representation is made. So things that Conway did thereafter were not part of the conduct that could even be known. But even OTS, when it conducted its investigation, concluded that this bank was not unsafe and unsound. They looked at the issue of safety and soundness, and they concluded that this bank, because of the rest of its management, was not unsafe or unsound. We put in evidence on this motion, examination reports, testimonies of the regulators. They consistently testified. I'll give you some examples. Caton testified. The management was sterling. We had a lot of confidence in them. That's at A24. Angela Vigna, the principal regulator of this institution, described the management of these banks as knowledgeable, extremely capable, people of integrity and trustworthy. And when I asked him at his deposition, why did you determine not to bring charges against the bank, he said, because they were financially sound and we had confidence in the rest of the management. The record seems to belie all that. Sterling competence, when they have authorized this person to be the chairman and the CEO, and didn't supervise him, apparently, whatever, sterling management surely is not, no matter what they say. I'm not referring to Conway's conduct, and we don't condone it, but remember, it was the banks who fought Conway's efforts to hide the compensation arrangements, as the court points out in its opinion. And they were the ones who brought the facts known to the OTS. They otherwise wouldn't have been discovered. This management acted properly in the circumstances. The question is, are you going to paint the whole management with respect to unsafe conduct because of what Conway did in 1983? And it was known to the regulators as well as the banks that he had an affiliation with the law firm. There was nothing wrong with that. In fact, what was wrong with it, if there was something wrong, was that his fees were based in part on compensation that came from borrowers in the closing process, and then later, 1985, 1986, he began to place his family members in the law firm and to receive compensation from them. But the record reflects the scheme started in 1982. And he executed the agreement on August 17, 1983. There was also evidence in the record showing that he misled some of the individuals who were part of the bank and maybe even some of the regulators, saying that he was under the required disclosure of $500,000. Is that correct? That occurs after that time, but that is correct. He did intentionally keep his compensation below the level of disclosure so that he would avoid having to trigger the disclosure requirements. Well, the disclosure was probably a misrepresentation also because if you go back through the record, I have not seen the entire record, but it shows that there was a scheme in which there was funds paid to him of about $11 million, $12 million. His entire family over the period from 1983 till he resigned from the firm in 1989. If I remember the regulations correctly, his family then was part of an affiliate, and they should have been added as part of the total compensation to go over the $500,000. Perhaps, Your Honor. I'm not disagreeing with that. But I'm saying that under this contract, the only representation that was made was under 11b-5 that spoke solely as of the closing. The banks never thereafter delivered further representations. And let me add one other thing. It's our position that the government did not prove that Conway was violating RESPA at contract signing. There are a couple of points in that regard. He was never charged ever with a RESPA violation. He never admitted a RESPA violation. What he consented to and was charged with by the OTS was a conflict of interest under 12 CFR 571.7. But we cite two courts of appeals cases which have held that 571.7 is a statement of policy only, not a regulation. And because it's a statement of policy only, it can't constitute a regulatory violation, so it would fall outside the bounds of the 11b-5 representation and the 8H covenant. And so the other thing is that at the time, Conway says he disclosed to the senior regulator that he had this arrangement with the firm. The regulator's dead, so we don't have any way to confirm it. But at the time, the bank board was taking the position that if you were receiving payments on account of your ownership interest, it was not a violation of RESPA. That position was subsequently confirmed to be the law by Congress. They thereafter imposed some disclosure requirements, but that occurred after August of 1983. So even if this court accepted the view that the government's view that a RESPA violation is per se unsafe management as of August 1983, it's still our position that there was a failure of proof in that regard. And if you read the opinion of Judge Margolis carefully, he does not resolve that issue. At A68 of his opinion, he assumes that there's a violation, and he doesn't need to reach it in the way he resolves the question. And the government refers to illustration 10. He's using, again, if you look at that page A68 carefully, he's using illustration 10 because he's analyzing whether or not the RESPA regulations draw a distinction between Conway acting in his individual capacity and the bank's in a corporate capacity. If the requirement for fraud in this court, 2514, is a very harsh requirement, and it requires proof by clear and convincing evidence that the fraud arose directly out of the contract sued upon. So while we can all be offended with Conway's conduct, you have to begin with the terms of this contract, and you have to decide whether or not the parties made a representation in regard to the conduct of affiliates. If you agree, as we do and as Judge Margolis did, that there was no requirement for disclosure as to the personal conduct of the officers and directors, then you have to ask yourself, is it per se unsafe, based on what Conway was doing in August 1993, to make these banks unsafe and unsound so as to say that they made a material misrepresentation to the government. And remember, even Angelo Vigna, when I asked him, what would you have done had it been disclosed, he said I would have told him to stop. It wasn't I would have put the bank out of business. I have little time left, and I'd like to at least make a couple points in regard to causation and damages. Well, you've got 18 seconds. We have your briefs. All right. I'd like to just say two things, then. The damage model that Judge Leto used in every respect is identical to what was used in the home savings decision. The tax gross-up meets exactly the same arguments that were addressed in Talman II. All right. I think we can figure it out from your briefs. Thank you. Thank you, Your Honor. Mr. Infelice. May it please the Court. Counsel for Long Island continues with the same error that happened at the trial court, and that is an attempt to focus on the underlying conduct of Mr. Conway when, in fact, the relevant question is, did he make misrepresentations in his official capacity as chairman and CEO of Long Island Savings Bank? The answer to that question is unequivocally yes. He did when he did acting as chairman and CEO in order for Long Island to be able to acquire the thrifts  and receive the assistance and the branches and everything else they received as a result of that. Now, one matter I think is necessary to be addressed, and that is counsel stated that he asked Mr. Vigna what she would have done had he told you, and he said, I would have told him to stop. While it is not in the appendix, there is a document which was attached to our answer, a declaration by Mr. Vigna concerning what his actions would have been had he known what had occurred. That document refutes what counsel says, clearly. Also, the idea of this fictional affiliate is really an attempt to sort of divert attention from the real issue. The real issue is whether or not anyone in Long Island was in a personal conflict of interest position which affected the safety and soundness of the institution. By definition, that means it has to involve some individual who is associated with Long Island. So therefore, by definition, the request or the certification which was required was a certification that, in fact, there is no conflict of interest which, by definition and under the rules and regulations as they existed, constitute or could create an unsafe and unsound condition. In this case, that statement by Mr. Conway was false. He knew it was false, and he did it with an intent to deceive. Thank you, Your Honor. Will you submit that document from the complaint? I will, Your Honor. To the clerk within three days? Yes, Your Honor. If you have any objection, compile a single page at that time. The case is submitted. All rise.